UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

ALLEGHENY COUPLING CO. and
ALLEGHENY VALVE CO.,

                          Plaintiffs,

   v.                                              **DECISION AND ORDER**
                                                            06-CV-426S

H&H METAL SPECIALTY, INC.,

                          Defendant.

## I.  INTRODUCTION

Plaintiffs in this action are Pennsylvania companies Allegheny Coupling and Allegheny Valve (collectively "Allegheny").  They develop and sell couplings and other products used to transfer liquids, including petroleum.  Defendant H&H Metal Specialty, Inc. ("H&H") is a tool and die shop in New York that has manufactured Allegheny's products for more than 50 years.  In 2004, Allegheny sought to end its relationship with H&H, which led to litigation.  The parties settled their differences and entered into a formal settlement agreement ("the Agreement").[1]  Now before this Court are the parties' competing claims that the other has breached the Agreement.

On December 14, 2006, H&H filed a Motion for Partial Summary Judgment on its first counterclaim, which seeks $244,000 plus interest for Allegheny's failure to pay for inventory.  Allegheny filed a Cross Motion for Partial Summary Judgment on liability for H&H's alleged breaches of the Agreement.[2]  After full briefing, this Court heard oral

---

[1] A copy of the Agreement is attached to the Complaint.

[2] The only breach of contract claims presently at issue are those that assert breach based on (1) H&H's failure and refusal to turn over dies, and (2) H&H's sale of products to Betts Industries, Inc. Allegheny asserted additional breach of contract claims in an Amended Complaint that was filed after the present motions were argued and submitted.  Those causes of action are not at issue.

argument on February 26, 2007, and reserved decision at that time.[3]  For the reasons that follow, the motions are denied.

## II.  FACTS

**A.   The Agreement**

The Agreement was executed on February 16, 2006.  It generally requires H&H to return inventory and equipment to Allegheny in exchange for certain payments and debt forgiveness.  Raymond Heelan, president of Allegheny, and Paul Harris, Jr., president of H&H, executed the Agreement.

### 1.   Transfer of Property

H&H agreed to relinquish and return Allegheny's property and equipment, including certain dies, jigs, presses, manufacturing equipment, machinery, fixtures, stamps, tools, accessories, intellectual property, and drawings.  (Agreement, ¶ 1.)  The parties defined Allegheny's property as those items listed in Exhibit A of the Agreement, and agreed that Allegheny's dies included all of those listed in Exhibit B.  (Agreement, ¶ 1.)  Allegheny agreed that it would take all reasonable and necessary steps to remove its property in a manner that would not interfere with H&H's continuing business.  (Agreement, ¶ 1.)  Allegheny also agreed to transfer ownership of certain of its equipment to H&H.  (Agreement, ¶ 1.)

---

[3]In support of its motion, H&H filed the declaration of Kenneth W. Africano, Esq., the declaration of John Traniello, a memorandum of law, a Rule 56.1 Statement of Undisputed Facts, a the reply declaration of Kenneth W. Africano, Esq., the reply declaration of John Traniello, the declaration of Brian Ceci, a Rule 56.1 Statement of Disputed Facts, a reply memorandum of law, and the supplemental declaration of Amanda McCormick, Esq.
    In support of its cross motion (and in opposition to H&H's motion), Allegheny filed the declaration of Maureen Bass, Esq., the declaration of Raymond Heelan, the declaration of Jamie Sitler, a Rule 56.1 Statement of Undisputed Facts, and a memorandum of law.

H&H agreed to allow Allegheny to inspect the property in its possession and to remove all dies that H&H would not be using to finish manufacturing current Allegheny products. (Agreement, ¶ 2.) Allegheny agreed that it would take receipt of its property from H&H in an "as is" condition as of February 2, 2006. (Agreement, ¶ 2.) H&H also agreed not to modify, alter, or tamper with Allegheny's property, and further agreed to take all reasonable and necessary steps to prevent any damage to the property. (Agreement, ¶ 2.)

 **2.** **Inventory**

H&H agreed to use its existing usable inventory of approximately $200,000 – $300,000 worth of Allegheny products to fill Allegheny's orders, and further agreed not to increase its inventory after February 2, 2006. (Agreement, ¶ 4.) Other than under circumstances specifically defined in the Agreement, H&H also agreed to stop selling or transferring Allegheny's products to Betts Industries, Inc. (Agreement, ¶ 4.) The parties agreed on a valuation schedule for the usable inventory, and Allegheny agreed to make 4 payments of $50,000 each at 30, 60, 90, and 120 days. (Agreement, ¶ 4.) Allegheny further agreed to pay for any excess inventory over $200,000 at 180 days. (Agreement, ¶ 4.) H&H agreed to box and ship the useable inventory pursuant to the customary standards between the parties (Agreement, ¶¶ 2, 4.)

 **3.** **Non-Compete and Consulting Agreements**

H&H agreed to a separate non-compete agreement as part of the overall Agreement. (See Agreement, Exhibit C.) Specifically, H&H, Paul Harris, Bruce Harris, Thomas Harris, John Traniello, and Brian Ceci agreed not to compete with Allegheny for

a 30-month period, with the exception of certain authorized sales to Betts Industries, Inc., as defined in the non-compete agreement. (Agreement, Exhibit C.) H&H also agreed that Allegheny could monitor compliance with the non-compete agreement through random, no-notice inspections of its entire premises during normal business hours. (Agreement, ¶ 5.) The parties agreed that the inspections could last no more than 1 hour and could occur no more than once per week during the 30-month period. (Agreement, ¶ 5.) Allegheny agreed that it would inspect the premises in a manner causing as little interruption of H&H's business operations as possible. (Agreement, ¶ 5.)

Further, Allegheny agreed to pay H&H a consulting fee of $150,000 in exchange for H&H providing it with a list of all of its vendors, the materials purchased from the vendors, and contact information for each vendor. (Agreement, ¶ 6.) The parties agreed that Allegheny would pay the consulting fee in 30 monthly installments of $5,000 each. (Agreement, ¶ 6.)

4.     **Settlement Payment and Releases**

Allegheny agreed that within 20 days of taking possession of its property as listed in Exhibits A and B of the Agreement, it would pay H&H $197,200 in full settlement of all claims and causes of action. (Agreement, ¶ 7.) It further agreed to forgive $115,000 worth of promissory notes that it had received from H&H. (Agreement, ¶ 9; Sitler Declaration, ¶ 3.)

The parties also agreed to exchange general releases after H&H received the full settlement payment from Allegheny. (Agreement, ¶ 8, Exhibit D.) The parties further agreed and acknowledged that despite the possible discovery of new facts or

circumstances that may be different from those it believed to be true at the time of the execution of the Agreement, the releases would be effective in all respects.  (Agreement, ¶ 11.)

## B.   Post-Settlement Conduct

Allegheny maintains that after the execution of the Agreement, it discovered that some of the inventory it received from H&H was mislabeled, miscounted, or defective. (Heelan Declaration, ¶¶ 29, 30.)  It also states that some of the dies it obtained under the terms of the Agreement had been irreparably tampered with and some dies were not turned over at all.  (Heelan Declaration, ¶¶ 31, 36, 37.)  Additionally, Allegheny states that H&H continued to sell unauthorized products to Betts Industries between the time the settlement was reached and the time the Agreement was executed (about 14 days). (Heelan Declaration, ¶¶ 21, 34.)   Nonetheless, Allegheny paid H&H the $197,200 settlement amount and forgave the approximately $115,000 in promissory notes.  (Heelan Declaration, ¶ 32.)  It also made a $50,000 inventory payment and a $5,000 consulting payment.  (Heelan Declaration, ¶ 33.)

H&H provided Allegheny with $294,364.89 worth of usable inventory in February and March of 2006.  (Traniello Declaration, ¶ 4.)  According to H&H, Allegheny never complained about the quality or quantity of inventory it bought pursuant to the Agreement. (Traniello Declaration, ¶ 6.)  Allegheny made a partial payment of $50,000 on April 5, 2006, but has not made any more payments.  (Traniello Declaration, ¶ 5.)  H&H maintains that it was customary for Allegheny to object to inventory and return it for credit when it was dissatisfied, but Allegheny did not do so with regard to the inventory provided under the

Agreement.  (Traniello Declaration, ¶ 6.)  Allegheny only objected to the quality of the inventory after this litigation ensued, some 7 months after receipt of the inventory. (Africano Declaration, ¶ 9.)

### III.  DISCUSSION AND ANALYSIS

**A.**     **Summary Judgment Standard**

Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment is warranted where the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c).  A "genuine issue" exists "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).  A fact is "material" if it "might affect the outcome of the suit under governing law." Id.

In deciding a motion for summary judgment, the evidence and the inferences drawn from the evidence must be "viewed in the light most favorable to the party opposing the motion." Addickes v. S.H. Kress and Co., 398 U.S. 144, 158-59, 90 S.Ct.1598, 1609, 26 L.Ed.2d 142 (1970).  "Only when reasonable minds could not differ as to the import of evidence is summary judgment proper." Bryant v. Maffucci, 923 F.2d 979, 982 (2d Cir. 1991).  The function of the court is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Anderson, 477 U.S. at 249.

**B.    Allegheny's Cross Motion for Partial Summary Judgment**

Allegheny moves for partial summary judgment on its first two causes of action alleging breach of contract and its cause of action seeking attorneys fees. To establish a claim for breach of contract, a plaintiff must demonstrate (1) that a contract between the parties existed, (2) that the plaintiff performed its obligations under the contract, (3) that the defendant breached its obligations under the contract, and (4) that the plaintiff suffered damages. See Terwilliger v. Terwilliger, 206 F.3d 240, 245-46 (2d Cir. 2000); Rexnord Holdings, Inc. v. Bidermann, 21 F.3d 522, 525 (2d Cir. 1994); W.B. David & Co., Inc. v. DWA Commc'ns, Inc., No. 02 Civ. 8479, 2004 WL 369147, at *2 (S.D.N.Y. Feb. 26, 2004). Neither party disputes that the Agreement constitutes an enforceable contract. At issue is whether either or both parties breached their obligations under the Agreement.

    **1.    Allegheny Has Failed to Establish That H&H Breached the Agreement by Failing to Turn Over Dies**

Allegheny asserts that H&H breached the Agreement by failing to turn over dies. But Allegheny fails to identify the dies that H&H allegedly retained, and has not come forward with any evidence that these dies were required to be turned over under the Agreement. Raymond Heelan maintains that H&H failed to turn over dies, but he does not identify the dies at issue, nor does he state that the dies were listed on Exhibit B of the Agreement. (Heelan Declaration, ¶¶ 31, 38, 39.) Similarly, although Thomas Harris stated at his deposition that H&H retained 30 dies that could be used to make Allegheny products, there is no showing that H&H was required to turn over these dies under the terms of the Agreement. (Bass Declaration, Exhibit 6.)

    It is well-settled that where "a contract is clear, courts must take care not to alter or

go beyond the express terms of the agreement, or to impose obligations on the parties that are not mandated by the unambiguous terms of the agreement itself." <u>Red Ball Interior Demolition Corp. v. Palmadessa</u>, 173 F.3d 481, 484 (2d Cir. 1999).  A party "cannot create an ambiguity in an otherwise plain agreement merely by 'urg[ing] different interpretations in the litigation.'"  <u>Palmadessa</u>, 173 F.3d at 484.  When "'the intent of the parties can be determined from the face of the agreement, interpretation is a matter of law,' and a claim turning on that interpretation may thus be determined by summary judgment or by dismissal."  <u>PaineWebber, Inc. v. Bybyk</u>, 81 F.3d 1193, 1199 (2d Cir. 1996) (quoting <u>American Express Bank Ltd. v. Uniroyal, Inc.</u>, 164 A.D. 2d 275, 277 (1st Dep't 1990)).

The language in the Agreement governing the return of dies is unambiguous.  It requires that H&H "relinquish possession of all property of [Allegheny's] located at [H&H's] premises or under the control of [H&H], including but not limited to all dies (with the exception of the few dies owned by Betts Industries and other miscellaneous dies *not listed in Exhibit B, infra*) . . . ."  (Agreement, ¶ 1 (emphasis added).)  The Agreement recites that "[H&H] affirms that Allegheny's dies include all of the dies listed on the December 2003 Industrial Appraisal Company appraisal, as well as over 100 dies that were not listed on such appraisal; *all such dies are listed in the attached Exhibit B*."  (Agreement, ¶ 1 (emphasis added).)  Exhibit B of the Agreement contains a 6-page itemized list of all the dies at issue.  (Agreement, Exhibit B.)

In its motion, Allegheny represents that the Settlement Agreement requires H&H to turn over all of Allegheny's property "including but not limited to all dies . . ." (Allegheny's Memorandum of Law, p. 3.)  But this representation is inaccurate.  It omits the Agreement's

key modifier, which is the parenthetical phrase that excludes certain dies from the definition of "all dies." (Agreement, ¶ 1.) Allegheny also ignores the fact that the Agreement twice references that the dies at issue are those "listed in Exhibit B." (Agreement, ¶ 1.) If the agreement was that H&H turn over all dies without limitation, there would be no need for the inclusion of qualifiers or for the creation of Exhibit B.

Thus, this Court finds that under the unambiguous language of the Agreement, H&H is required to relinquish possession of only those dies listed in Exhibit B. Allegheny has not come forward with any evidence demonstrating that H&H failed to turn over any such dies.[4] To the contrary, H&H has presented evidence that it in fact relinquished possession of all the dies in Exhibit B. Brian Ceci, H&H's Plant Manager, attests that Allegheny took possession of all dies listed in Exhibit B between February 20, 2006, and March 2, 2006. (Ceci Declaration, ¶ 3.) Moreover, H&H submitted signed documentation from Allegheny confirming that it received the dies. (Ceci Declaration, Exhibit G.)

And to the extent Allegheny now argues that the 30 dies at issue were not known to it at the time of the Agreement, such a claim is barred by the terms of the Agreement and the general releases. (Agreement, ¶ 11 and Exhibit D.)

Accordingly, this Court finds that Allegheny has failed to come forward with evidence from which it could reasonably be determined that H&H breached the Agreement by failing to turn over dies. Allegheny's request for summary judgment on this claim is therefore denied, and its first cause of action is dismissed.

---

[4] Allegheny's argument that Brian Ceci understands the Agreement to require H&H to turn over "any die that was ever used to make an Allegheny product" is unavailing because Ceci's understanding is directly contrary to the unambiguous language of the Agreement, and in any event, it is this Court, not Ceci, that is charged with interpreting the Agreement. (Bass Declaration, Exhibit 4.)

## 2. Allegheny Has Failed to Establish That H&H Breached the Agreement by Selling Allegheny Products to Betts Industries, Inc.

Allegheny asserts that H&H improperly sold Allegheny products to Betts Industries between February 2, 2006, the date of the mediation session, and February 16, 2006, the date the Agreement was executed. H&H does not dispute that it made sales to Betts before the Agreement was executed. Allegheny maintains that H&H breached the Agreement by making these sales to Betts. As this Court understands it, there is no evidence of unauthorized sales between H&H and Betts post-dating the execution of the Agreement, at least none that Allegheny has provided on this motion.

This Court finds no breach. It is undisputed that Allegheny knew of H&H's post-mediation sales to Betts, but executed the Agreement anyway. (Heelan Declaration, ¶¶ 34.) It therefore waived any claims it may now have by operation of the release. (Agreement, Exhibit D.) And in the absence of any evidence that H&H made unauthorized sales to Betts after the execution of the Agreement, Allegheny is not entitled to judgment in its favor. Consequently, Allegheny's request for summary judgment on this claim is denied, and its second cause of action is dismissed.

## 3. Allegheny Is Not Entitled to Summary Judgment on its Claim for Attorneys' Fees and Costs

Allegheny seeks its reasonable attorneys' fees and costs based on the provision in the Agreement that provides for such an award to the prevailing party if litigation is necessary to enforce the Agreement. (Agreement, ¶ 16.) Because Allegheny has not established that H&H breached the Agreement, it is not entitled to summary judgment on this claim. But as this Court noted, Allegheny filed an Amended Complaint and added

several more causes of action.  Therefore, the issue of attorneys' fees and costs cannot be decided in either party's favor at this time.  Allegheny's request for summary judgment on this claim is denied.

## C.   H&H's Motion for Partial Summary Judgment

H&H seeks summary judgment on its first counterclaim, which asserts a claim for $244,000 in unpaid inventory payments from Allegheny.  H&H first argues that it is entitled to summary judgment under an "account stated" or "goods sold and delivered" theory.  Alternatively, it argues that it is entitled to summary judgment under a breach of contract theory.  In this Court's view, both arguments fail at this juncture.

First, this Court finds that the theories of "account stated" and "goods sold and delivered" are not applicable in this multi-faceted settlement agreement.  Account stated "is an agreement between parties to an account based upon prior transactions between them with respect to the correctness of the account items and balance due."  Manhattan Motorcars, Inc. v. Automobili Lamborghini, No. 07 Civ. 978, 2007 WL 1988144, at *6 (S.D.N.Y. July 9, 2007); see also Eastman Kodak Co. v. W.H. Kenken Indus., Inc., No. 05-CV-6425, 2007 WL 1726472, at *3 (W.D.N.Y. June 14, 2007).  The similar theory of goods sold and delivered applies when there is "the purchase, sale and delivery of goods at an established price and the non-payment therefor."  A.H.A. Int'l Co., Ltd. v. Amerol Corp., No. 05-6114, 2007 WL 1352376, at *2 (E.D.N.Y. May 8, 2007) (citing Conoco Phillips v. 261 Merrick Rd. Corp., 428 F.Supp.2d 111, 126 (E.D.N.Y. 2006)).

These theories are most often applied in cases where invoices go unpaid.  See Eastman Kodak, 2007 WL 1726472, at *3; Conocophillips, 428 F.Supp.2d at 126

11

(explaining that plaintiff must show that defendant received invoices from plaintiff and defendant failed to object within reasonable time or defendant made partial payment on account); Amerol Corp., 2007 WL 1352376, at *2 . H&H has not presented any authority for application of these doctrines to enforcement of one of many promises made in the context of a global settlement agreement.[5]

Second, this Court finds that H&H's breach of contract argument cannot be decided at this time because of the unusual posture of this case. To succeed on a breach of contract claim against Allegheny, H&H must to prove that it is in full compliance with its own obligations under the Agreement. See Terwilliger, 206 F.3d at 245-46. Allegheny's Amended Complaint adds three new breach of contract claims against H&H, none of which are at issue on this motion. In two of those causes of action, Allegheny asserts that H&H improperly tampered with and packaged the inventory. (Amended Complaint, ¶¶ 39-44.) Because these two causes of action are directly tied to inventory, this Court cannot parse this claim as an independent covenant as H&H argues. Until such time as all of the claims are before this Court, H&H's breach of contract argument cannot properly be decided. Consequently, this Court will deny H&H's request for summary judgment based on a breach of contract theory without prejudice at this time.

## IV.  CONCLUSION

For the reasons stated above, H&H's Motion for Partial Summary Judgment and Allegheny's Cross Motion for Partial Summary Judgment are denied. Further, the first two causes of action in the Amended Complaint (which are the same causes of action from the

---

[5] H&H's "goods sold and delivered" theory fails for the same reason.

original Complaint), are dismissed.

## V.  ORDERS

IT HEREBY IS ORDERED, that H&H's Motion for Partial Summary Judgment (Docket No. 24) is DENIED.

FURTHER, that the first two causes of action in the Amended Complaint (Docket No. 62) are DISMISSED.

FURTHER, that Allegheny's Cross Motion for Partial Summary Judgment (Docket No. 44) is DENIED.

SO ORDERED.

Dated: September 23, 2007
Buffalo, New York

<u>/s/William M. Skretny</u>
WILLIAM M. SKRETNY
United States District Judge
